**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

MARK LACY,

      Plaintiff,

vs.                                      No. CIV 25-0118 JB/SCY

CHRISTUS ST. VINCENT REGIONAL
MEDICAL CENTER,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant Christus St. Vincent Regional

Medical Center's Motion to Dismiss Defendant Mark Lacy's Claims, filed July 22, 2025 (Doc.

17)("Motion to Dismiss").  The Court holds a hearing on December 1, 2025.  See Clerk's Minutes

at 1, filed December 1, 2025 (Doc. 30).  The primary issues are: (i) whether Lacy's claims should

be dismissed for failure to exhaust administrative remedies, where Christus St. Vincent has notice

of the allegations and participates in the EEOC proceedings; (ii) whether the First Amended

Complaint plausibly states a prima facie claim for religious discrimination based on a failure to

accommodate; (iii) whether Lacy's claims fail as a matter of law because the requested

accommodation constitutes an undue hardship under the New Mexico Human Rights Act, N.M.

Stat. Ann. § 28-1-7(F), or 42 C.F.R. §§ 482.13(b)(1), (c)(3); and (iv) whether Christus St.

Vincent's interpretation of those provisions would impermissibly compel a private physician's

speech in violation of the First Amendment.  The Court concludes that: (i) dismissal for lack of

exhaustion is unwarranted, because Christus St. Vincent has notice of and actively participates in

the EEOC proceedings; (ii) the First Amended Complaint plausibly alleges a prima facie claim for

religious discrimination based on a failure to accommodate; (iii) dismissal on undue hardship

grounds is inappropriate, because neither § 28-1-7(F) nor 42 C.F.R. §§ 482.13(b)(1), (c)(3)

compels preferred-pronoun use; and (iv) Christus St. Vincent's reading of those provisions would compel private speech in violation of the First Amendment.  The Court therefore denies the Motion to Dismiss.

## FACTUAL BACKGROUND

The Court takes its background facts from the First Amended Complaint, filed May 21, 2025 (Doc. 12)("FAC").  It recites them solely for context and not as findings of fact.  The Court does not determine the truth from these facts.

This case centers on a clash between a private physician's religious convictions and his employer's expectations.  Lacy -- a seasoned infectious disease specialist -- joins Christus St. Vincent in August 2022.  See FAC ¶¶ 6, 9, at 2-3.  Lacy is a devout Christian whose beliefs include that sex is biologically fixed and that contemporary gender theory conflicts with his understanding of human dignity.  See FAC ¶ 7, at 2.

For nearly a year, Lacy's work draws no complaints.  See FAC ¶ 10, at 3.  That changed on June 6, 2023, when he examines a patient hospitalized with a hip infection and suffering from a severe migraine.  See FAC ¶¶ 11, 12, at 3.  Lacy dims the lights and applies a cold cloth on the patient's forehead while he performs bedside manner.  See FAC ¶ 11, at 3.  At no time during the visit did the patient communicate to Lacy what the patient's preferred pronouns are.  See FAC ¶ 11, at 3.  Based on the medical record, Lacy understands the patient to be a biological male identifying as a female.  See FAC ¶ 13, at 3.  The patient later alleges that Lacy "misgendered" the patient both in person and in Lacy's consultation report.  See FAC ¶ 14, at 3.

The patient subsequently files a formal claim asserting that Lacy refuses to use preferred pronouns, and behaves in a "short and curt" manner.  FAC ¶ 14, at 3.  Lacy is summoned to an administrative meeting on June 7, 2023.  See FAC ¶ 15, at 4.  According to Lacy, the administrator handling the matter -- who identifies as a lesbian -- expresses hostility toward his religious views

and tells him: "you need to leave whatever religious ideas you have at home when you walk in the door to work here."  FAC ¶ 16, at 4.  At the time, the hospital has no written policy regarding pronoun usage or the treatment of transgender patients.  See FAC ¶ 17, at 4.

On June 14, 2023, Lacy submits a request for religious accommodation.  See FAC ¶ 18, at 4.  He explains that his religious and medical beliefs prevent him from using pronouns inconsistent with a patient's biological sex, but he offers to rely on gender-neutral terminology as a compromise.  See FAC ¶ 19, at 4.  Christus St. Vincent declines to engage in any accommodation process.  See FAC ¶ 20, at 5.  Instead, on June 22, 2023, the hospital terminates Lacy's employment for refusing to use preferred pronouns.  See FAC ¶ 21, at 5.

On September 19, 2023, Lacy files a charge of discrimination with the EEOC and with the New Mexico Department of Workforce Solutions.  See FAC ¶ 22, at 5.  He mistakenly lists "Christus Health," the parent company, as the respondent, but Christus St. Vincent nevertheless responds and participates in the proceedings.  See FAC ¶ 23, at 5.  The EEOC issues a Notice of Right to Sue on November 8, 2024.  See FAC ¶ 25, at 6.  Lacy has not yet received his State-agency notice, but he states that he intends to amend his complaint to add State law claims once he receives it.  See FAC ¶ 25, at 6.

## PROCEDURAL BACKGROUND

On February 4, 2025, Lacy files his original Complaint, mistakenly naming Christus Health -- the parent company -- rather than Christus St. Vincent as the Defendant.  See Complaint at 1. After recognizing the error, he files the FAC on May 21, 2025, naming Christus St. Vincent as the proper Defendant.  See FAC at 1.  The FAC asserts a single claim under Title VII of the Civil Rights Act of 1964.  See FAC ¶ 26, at 6.  Lacy also notes that he has not yet received a Notice of Right to Sue from the New Mexico Department of Workforce Solutions, but intends to amend his pleading to add parallel State law claims once that notice issues.  See FAC ¶ 26, at 6.

On July 22, 2025, Christus St. Vincent moves to dismiss the FAC for failure to state a claim. See Motion to Dismiss at 1. It makes two principal arguments. First, Christus St. Vincent contends that Lacy fails to exhaust his administrative remedies as to Christus St. Vincent, because his EEOC charge identifies only Christus Health. See Motion to Dismiss at 5-6. Second, Christus St. Vincent argues that Dr. Lacy cannot plausibly state a failure-to-accommodate claim, because any accommodation he proposes necessarily imposes an undue hardship as a matter of law; in its view, federal and state law foreclose the gender-neutral language that he requests. See Motion to Dismiss at 8-9.

On August 5, 2025, Lacy files Plaintiff's Response in Opposition to Defendant's Motion to Dismiss (Doc. 18)("Response"). He argues that he exhausts his administrative remedies, because Christus St. Vincent receives notice of the EEOC charge and participates in the agency process. See Response at 5. As to undue hardship, he advances three counterarguments. First, the motion-to-dismiss stage is not the proper posture for resolving a fact-intensive inquiry like undue hardship. See Response at 12. Second, he contends that using gender-neutral terms is not an undue hardship as a matter of law, because Title VII does not require the use of preferred pronouns. See Response at 14. Third, he asserts that Christus St. Vincent's reading of the New Mexico statute is incorrect and, if accepted, renders the statute unconstitutional under the First Amendment. See Response at 19.

On August 18, 2025, Christus St. Vincent files the Defendant's Reply to Plaintiff's Response to Defendant's Motion to Dismiss (Doc. 20)("Reply"). It maintains that allowing Lacy to proceed despite not naming Christus St. Vincent in the EEOC charge renders the exhaustion requirement meaningless. See Reply at 1-2. It also reiterates that the use of gender-neutral language imposes an undue hardship by exposing the hospital to a heightened risk of legal liability. See Reply at 2. Finally, Christus St. Vincent argues that its reading of the New Mexico Human

Rights Act does not violate the First Amendment, because -- in its view -- the relevant Supreme Court decisions limit compelled-speech protections to expressive conduct, and the hospital's physicians are not engaged in such expressive activity.  See Reply at 8.

### LAW REGARDING MOTION TO DISMISS UNDER RULE 12(B)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  A court also may consider documents to which the complaint refers, if their adequacy is central to the plaintiffs' claims and their authenticity is unquestioned.  See Armstrong v. N.M. Disability Det. Servs., 278 F. Supp. 3d 1193, 1201 n.3 (D.N.M. 2017)(Browning, J.)(concluding that the court properly considers notices attached to the motion and not to the complaint, because the complaint references them, their adequacy is central to the plaintiffs' claims, and their authenticity was unquestioned).  See also GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997)(Kelly, J.)("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered . . . .").

A complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all

well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (quoting Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).  At the motion-to-dismiss stage, the court does not weigh the evidence, and "is interested only in whether it has jurisdiction and whether the Plaintiffs plead a claim to relief that is plausible on its face."  Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Iqbal, 556 U.S. at 678.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp v. Twombly, 550 U.S. at 555.  See Duncan v. Citibank (S.D.), N.A., No. CIV 06-0246 JB/KBM, 2006 WL 4063021, at *3 (D.N.M. June 30, 2006)(Browning, J.)(dismissing a civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), cause of action from a complaint where the complaint alleges a single physical act, and not a pattern of racketeering activity, and a pattern of activity is one of the elements required to state a RICO claim).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556).  "Thus, the mere metaphysical possibility that some

plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). A court will not construe a plaintiff's pleadings "so liberally that it becomes his advocate." Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.). The Tenth Circuit states:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

Generally, the complaint's sufficiency must rest on its contents alone. See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 25 (10th Cir. 2005)("In ruling on a motion to dismiss, the district court is limited to the facts pled in the complaint."). Emphasizing this point, the Tenth Circuit, in Carter v. Daniels states: "When ruling on a Rule 12(b)(6) motion, the district court must examine only the plaintiff's complaint. The district court must determine if the complaint alone is sufficient to state a claim; the district court cannot review matters outside of the complaint." 91 F. App'x 83, 85 (10th Cir. 2004). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor

Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(holding that the district court does not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which are "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion."  627 F.3d at 1186.  The Tenth Circuit holds that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment."  627 F.3d at 1186-87.  In other cases, the Tenth Circuit emphasizes that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."  Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addresses an untimely filed charge with the EEOC -- which contains time limitations that the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court previously rules that, when a plaintiff references and summarizes the

defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasons that the statements are neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cites the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court also previously rules that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff is aware of the defendant's alleged fraud before the statutory period expires. See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree"). The Court in Crabtree determines that the documents do not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint does not incorporate the documents by reference or refer to the documents. See 2012 WL 3656500, at *22-23; Mocek v. City of Albuquerque, 2013 WL 312881, at *50 (refusing to consider statements that were not "central to [the plaintiff's] claims").

On the other hand, in a securities class action and as an exception to the general rule, the Court has concludes that the Court may consider a defendant's operating certification, to which the plaintiffs refer in their complaint, and which are central to whether the plaintiffs adequately allege a loss, when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment. See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.). See also SEC v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, emails referenced in the complaint as "documents referred to in the complaint," which are "central

to the plaintiff's claim" and whose authenticity the plaintiff does not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they are "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING EXHAUSTION OF ADMINISTRATIVE REMEDIES

Plaintiffs must exhaust both Title VII of the Civil Rights Act of 1964 and New Mexico Human Rights Act ("NMHRA") N.M. Stat. Ann. §§ 28-1-1 to -15, claims before being brought in federal court. Title VII creates a work-sharing deferral system between the EEOC and the States that have their own employment discrimination legislation. See 42 U.S.C. § 2000e-5(c), (d). In the States that possess their own employment discrimination legislation, the EEOC generally must "defer" to State or local remedies. EEOC v. Superior Temp. Servs., Inc., 56 F.3d 441, 447 (2d Cir. 1995)(quoting 42 U.S.C. § 2000e-5(c), (d)). The NMHRA places New Mexico among those States that have their own employment discrimination legislation and contact agencies. See 29 C.F.R. § 1601.74 (2005). In New Mexico, a complainant can, upon meeting filing requirements, proceed with his or her grievance either through the EEOC or through the New Mexico Human Rights Division ("NMHRD"). See Mitchell-Carr v. McLendon, 1999-NMSC-025, ¶¶ 10-14, 980 P.2d 65, 69-70. "In a State that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a grievance with that agency must file the charge with the EEOC within 300 days of the employment practice." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). Once a person elects to proceed with his or her complaint under State law, the NMHRA controls the grievance procedures for resolving the complaint. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 109.

Previously, whether complainants decide to pursue their grievances with the EEOC or with

the NMHRD, they had to exhaust their respective regimes' administrative remedies before seeking judicial review.   See Jones v. Runyon, 91 F.3d 1398, 1399 (10th Cir. 1996)("Exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."); Mitchell-Carr v. McLendon, 1999 NMSC-025, ¶ 20, 980 P.2d at 71 ("[E]xhaustion of administrative remedies is a prerequisite to suit under the NMHRA, and a failure to exhaust administrative remedies may mean that the court lacks subject-matter jurisdiction.")(citing Luboyeski v. Hill, 1994-NMSC-032, ¶ 7, 872 P.2d 353, 355 (1994)).   The Tenth Circuit changes course in Lincoln v. BNSF Ry. Co., 900 F.3d 1166 (10th Cir. 2018), in holding that a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim.   Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1185 (10th Cir. 2018).

Title VII prohibits an employer from "fail[ing] or refus [ing] to hire or . . . discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e–2(a)(1).   Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e-5(f)(1), allows a plaintiff to bring a civil action only against the respondent that he or she names in the EEOC charge, and only after administrative remedies have been exhausted. See Romero v. Union Pac. R.R., 615 F.2d 1303, 1311 (10th Cir.1980)("Romero").   "Under long-standing [Tenth] [C]ircuit precedent, supervisors and other employees may not be held personally liable under Title VII."   Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1083 n.1 (10th Cir.2007).   See Haynes v. Williams, 88 F.3d 898, 899 (10th Cir.1996)("The relief granted under Title VII is against the employer, not individual employees whose actions would constitute a violation of the Act.").   Because laypersons, not attorneys, usually write EEOC complaints, they are liberally construed. See Romero, 615 F.2d at 1311. This naming requirement, however, is not

merely a technicality, but rather "brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law." Alvarado v. Bd. of Trs., 848 F.2d 457, 458 (4th Cir.1988)(quoting Bowe v. Colgate–Palmolive Co., 416 F.2d 711, 719 (7th Cir.1969)).

There are narrow exceptions to the rule requiring that each defendant be specifically named as a respondent in an EEOC charge.  For example, where the defendant is mentioned in the text of the charge or "where there is sufficient identity of interest between the respondent and the defendant to satisfy the intention of Title VII that the defendant have notice of the charge and the EEOC have an opportunity to attempt conciliation."  Romero, 615 F.2d at 1311.  Four factors are pertinent to the determination whether the omission of a defendant's name requires automatic dismissal in the court action under Title VII:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

Romero, 615 F.2d at 1312 (quoting Glus v. G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir.1977)). Additional relevant factors may also be evaluated.  See Romero, 615 F.2d at 1312.

Before commencing a Title VII action in federal court in a state with an agency empowered to investigate employment discrimination, like the NMHRD, "a plaintiff first must exhaust administrative remedies by filing a charge of discrimination with the EEOC within 300 days of the allegedly unlawful employment practice."  Castaldo v. Denver Public Sch., 276 Fed. Appx. 839, 841 (10th Cir.2008).  To exhaust administrative remedies, an individual claimant must: (i) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the

charge; and (ii) receive notice of the right to sue.  See 42 U.S.C. §§ 2000e-5(b)-(c), (e), (f)(1).

## LAW REGARDING TITLE VII EMPLOYMENT DICRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on race, color, religion, sex, or national origin."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 825 (1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  Title VII protects individuals from employers' improperly motivated adverse treatment in the workplace: "Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or discharging any individual, or otherwise discriminating against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(quoting 42 U.S.C. § 2000e-2(a)(1)).  With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees.  See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)); Walton v. N.M. State Land Office, 113 F. Supp. 3d 1178, 1184 (D.N.M. 2015)(Browning, J.); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1098 (D.N.M. 2011)(Browning, J.).

The Tenth Circuit liberally defines what constitutes an adverse employment action.  See Orr v. City of Albuquerque, 417 F.3d 1144, 1150 (10th Cir. 2005)("Because of the remedial nature of Title VII lawsuits, we broadly define adverse employment action.").  The Tenth Circuit states:

> Such actions are not simply limited to monetary losses in the form of wages or benefits. *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996). Instead, we take a "case-by-case approach," examining the unique factors relevant to the situation at hand. *Jeffries* [v. Kansas, 147 F.3d 1220, ]1232 [(10th Cir. 1998)]. Nevertheless, we will not consider "a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action. *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) . . . .

Sanchez v. Denver Pub. Sch., 164 F.3d 527, 532 (10th Cir. 1998).  See Proctor v. United Parcel Serv., 502 F.3d at 1208.  An adverse action "is not limited to discriminatory actions that affect the

terms and conditions of employment." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 64 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d 1126, 1133 (10th Cir. 2010)(quoting Burlington N. & Santa Fe Ry. v. White, 548 U.S. at 68). "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. v. White, 548 U.S. at 67-68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms."). "We construe the phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of wages or benefits.'" Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ., 595 F.3d at 1133 (quoting Annett v. Univ. of Kan., 371 F.3d 1233, 1239 (10th Cir. 2004)). Acts that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may be considered adverse actions, Berry v. Stevinson Chevrolet, 74 F.3d at 986, although "'a mere inconvenience or an alteration of job responsibilities' will not suffice," Annett v. Univ. of Kan., 371 F.3d at 1239 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532).

In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008) (unpublished), the Tenth Circuit, in an unpublished opinion, addresses the requirement of an adverse employment action in the context of a disparate-treatment claim and a hostile work environment claim. There, an employee, who had been placed on a growth plan, alleged other harsh treatment and a written reprimand in support of his claim that he suffered a hostile work environment. See 265 F. App'x at 704. Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), the plaintiff argued that the growth plan and formal reprimand rose to the level of an adverse employment action under Tenth Circuit law. See 265 F. App'x at 704. In MacKenzie

- 14 -

v. City & Cnty of Domier, the Tenth Circuit discussed Anderson v. Clovis Municipal School's reliance on Schuler v. City of Boulder and stated: "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions . . . would form the basis of a discrimination suit." 414 F.3d at 1279 (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996)). See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir. 2007)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's 'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] [the employee's] status as an employee" (second alteration added)(quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 533)). "Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." Robinson v. Cavalry Portfolio Servs., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1222). See Walton v. N.M. State Land Office, 113 F. Supp. 3d at 1190-92; Gerald v. Locksley, 785 F. Supp. 2d at 1100-01.

### LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment secures the "freedom of expression upon public questions." New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964). According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." Whitney v. California, 274 U.S. 357, 375 (1927). The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be

the secret of liberty." Whitney v. California, 274 U.S. at 375. The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile." Whitney v. California, 274 U.S. at 375. Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates. See Whitney v. California, 274 U.S. at 375. Robust public discussion is a "political duty" and is a "fundamental principle of the American government." Whitney v. California, 274 U.S. at 375. Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484 (1957).

The First Amendment, however, is not an absolute bar on government intervention. "No law," does not actually mean "no law." U.S. Const. amend. I. See Dennis v. United States, 314 U.S. 494, 503 (1951)Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values and considerations"); Ashcroft v. ACLU, 535 U.S. 564, 573 (2002)(stating that, "'as a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content," but "this principle, like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Prod. Corp., 463 U.S. 60, 65 (1983)). Although the First Amendment speaks in absolutist terms, courts have long recognized that governments Constitutionally can restrict speech and the press under certain conditions. See Holder v. Humanitarian L. Project, 561 U.S. 1, 26-29 (2010). Justice Oliver Wendell Holmes, Associate Justice of the Supreme Court, notes in his famous example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic." Schenck

- 16 -

v. United States, 249 U.S. 47, 52 (1919).  Not all speech is protected speech.  See Chaplinksy v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").  "[N]ot all speech is of equal First Amendment importance."  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum."  Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are Constitutional).  Moreover, the First Amendment's speech and press protections limit both State and federal government action.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment regulates "government regulation of private speech" and not government speech or purely private speech regulations.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Prod. Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

## ANALYSIS

The Court denies Christus St. Vincent's Motion to Dismiss.  First, the Court does not dismiss Lacy's claims for a lack of exhaustion, because Christus St. Vincent has notice of the claim and participates in the EEOC proceedings.  Second, the Court evaluates the First Amended Complaint's sufficiency and concludes that it states a prima facie claim for religious discrimination

based on a failure to accommodate.  Third, the Court does not dismiss Lacy's claims on undue-hardship grounds, because neither the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(F), nor 42 C.F.R. §§ 482.13(b)(1), (c)(3) compels preferred-pronoun use.  Fourth, the Court holds that Christus St. Vincent's reading of § 28-1-7(F) and 42 C.F.R. §§ 482.13(b)(1), (c)(3) impermissibly compels private physician's speech in violation of the First Amendment.

## I.    LACY EXHAUSTS HIS ADMINISTRATIVE REMEDIES, BECAUSE CHRISTUS ST. VINCENT HAS NOTICE OF HIS CLAIM AND PARTICIPATES IN THE EEOC PROCEEDINGS.

To survive a motion to dismiss under rule 12(b)(6), a plaintiff must allege "a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.  A court must consider the complaint in its entirety, documents that the complaint incorporates by reference, and plausible inferences.  See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322.  In considering dismissal pursuant to rule 12(b)(6), a court accepts as true all factual allegations to determine whether they are sufficient to state a claim for relief.  See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322.  Although courts ordinarily limit their review of a 12(b)(6) motion to dismiss to the allegations in the plaintiff's complaint, courts may also consider documents "incorporated into the complaint by reference."  TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1180 (10th Cir. 2007).

Christus St. Vincent asserts that the Court should dismiss Lacy's claims, because Lacy fails to exhaust his administrative remedies as to Christus St. Vincent.  See Motion to Dismiss at 17.  Christus St. Vincent argues that Lacy does not exhaust his administrative remedies as to Christus St. Vincent, because Lacy does not name Christus St. Vincent in his EEOC charge.  See Motion to Dismiss at 17.  Lacy responds that he exhausts his administrative remedies, because -- although

he fails properly to name Christus St. Vincent -- Christus St. Vincent receives notice of the charge and participates in the EEOC process.  See Response at 5.  The Court agrees that Christus St. Vincent receiving notice and participating in the EEOC process satisfies the exhaustion requirement in this case's circumstances.

In the Title VII context, federal courts recognize that laypersons and not attorneys usually write EEOC complaints, requiring that the courts liberally construe complaints.  See Romero, 615 F.2d at 1322.  The requirement that a person name the defendant in the discrimination charge is not merely a technicality, because it "brings the charged party before the EEOC and permits effectuation of the Act's primary goal, the securing of voluntary compliance with the law." Alvarado v. Bd. Of Trs., 848 F.2d at 458.  Under the federal law, there are some exceptions to the requirement that the person filing the charge of discrimination name the defendant in the charge. Romero, 615 F.2d at 1311.  Two exceptions are: (i) the charge's text mentions the defendant; or (ii) "there is sufficient identity of interest between the respondent and the defendant to satisfy the intention of Title VII that the defendant have notice of the charge and the EEOC have an opportunity to attempt conciliation."[1]  Romero, 615 F.2d at 1311.

Here, that the charge mentions Christus St. Vincent satisfies EEOC exhaustion.  See Romero, 615 F.2d at 1311.  In Lacy's EEOC charge, he mistakenly names "Christus Health" -- Christus St. Vincent's parent company -- as the respondent.  FAC ¶ 22, at 5.  Despite this misnomer, Christus St. Vincent knows that the charge mentions it, because Christus St. Vincent responds to the charge and participates in the EEOC process.  See FAC ¶ 23, at 5.  Christus St.

---

[1] Christus St. Vincent mistakenly argues that the analysis should fall under the second prong, analyzing whether there is a "sufficient identity of interest between the respondent and the defendant . . . ."  Motion to Dismiss at 6.  The Court concludes that the second prong is inapplicable, because the charge's text mentions Christus St. Vincent.  See FAC ¶¶ 22-24, at 5. Accordingly, the Court analyzes how Lacy satisfies the "informally mentioned" prong such that Lacy satisfies the administrative exhaustion requirement.

Vincent files an EEOC position statement which reads: "Although Charging Party named Christus Health in his Charge, his actual employer was St. Vincent Hospital d/b/a CHRISTUS [sic] St. Vincent Regional Medical Center, and St. Vincent responds as such." FAC ¶ 24, at 5. Christus St. Vincent's position statement makes substantive legal argument in its position's favor, never arguing that the misnomer requires the EEOC's dismissal of the charge. See FAC ¶ 24, at 5. An EEOC investigation's purpose also supports the Court's conclusion that Lacy exhausts his administrative remedies. The exhaustion requirement's purpose is to give the defendant notice of the charge, and to allow the agency's investigation and attempted reconciliation of the matter. See Campos v. Las Cruces Nursing Center, 828 F. Supp. 2d 1256, 1277 (D.N.M. 2011)(Browning, J.). Not only does Christus St. Vincent have notice of the charge, but they also participate in the EEOC investigation, thus, allowing the EEOC to investigate and to attempt reconciliation of the matter. See FAC ¶¶ 22-24, at 5.

Several Courts of Appeals hold that, when an unnamed party has notice of the EEOC proceedings and participates in the proceeding, the suit can proceed. In Sosa v. Hiraoka, 920 F.2d 1451 (9th Cir. 1990), the United States Court of Appeals for the Ninth Circuit endorses such an exception: "[I]f the unnamed party had notice of the EEOC conciliation efforts and participated in the EEOC proceedings, then suit may proceed against the unnamed party." 920 F.2d at 1459. In Eggleston v. Chicago Journeymen Plumbers Local Union No. 130, U.A., 657 F.2d 890 (7th Cir. 1981), the United States Court of Appeals for the Seventh Circuit holds that the court should not dismiss the plaintiff's claims for failure to exhaust EEOC administrative remedies, because -- although the plaintiff improperly names the defendant in the EEOC charge -- the defendant "was properly noticed and provided with the requisite opportunity for conciliation." 657 F.2d at 907. In Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256 (3rd Cir. 2006), the United States Court of Appels for the Third Circuit denies a motion to dismiss where the employer "received a notice and

copy of the charge, and filed a lengthy and detailed response on the merits, without mentioning the plaintiff's failure to verify the charge, all before the EEOC issued a right to sue letter." 452 F.3d at 262. Like in these cases where dismissal is inappropriate, because the misnamed defendant receives notice of the EEOC charge and has the opportunity to participate in the process, Christus St. Vincent receives notice of Lacy's EEOC charge and participates in the EEOC process. See FAC ¶¶ 22-24, at 5. The Court therefore concludes that Lacy exhausts his administrative remedies and denies the Motion to Dismiss for lack of exhaustion.

## II.    LACY'S FIRST AMENDED COMPLAINT PLAUSIBLY ALLEGES A PRIMA FACIE CASE FOR RELIGIOUS DISCRIMINATION BASED ON A FAILURE TO ACCOMMODATE.

To survive a motion to dismiss under rule 12(b)(6), a plaintiff must raise "a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. A court must consider the complaint in its entirety, documents that the court incorporates by reference, and plausible inferences. See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322. In considering dismissal pursuant to rule 12(b)(6), a court accepts as true all factual allegations to determine whether they are sufficient to state a claim for relief. See Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. at 322. Although courts ordinarily limit their review of a 12(b)(6) motion to dismiss to the allegations in the plaintiff's complaint, courts may also consider documents "incorporated into the complaint by reference." TMJ Implants, Inc. v. Aetna, Inc., 498 F.3d 1175, 1180 (10th Cir. 2007).

Under Title VII, to establish a prima facie case for religious discrimination for failure to accommodate, Lacy bears the burden to establish: (i) "he or she has a bona fide religious belief that conflicts with an employment requirement"; (ii) "he or she informed the employer of this

- 21 -

belief"; and (iii) the employer discharges, threatens, or otherwise subjects him to an adverse employment action because of his inability to fulfill the job requirement.  Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1155 (10th Cir. 2000).  The FAC alleges the following facts relevant to Lacy's failure to accommodate claim:

> 6.      Dr. Lacy is an experienced and licensed physician specializing in infectious disease and is well regarded in his field.
>
> 7.      Dr. Lacy is also a practicing Christian who, informed by his Christian faith, believes that sex is a binary between male and female.  He believes that the post modern construction of gender as a social construct violates the God-given dignity of the human person because it leads people who suffer from gender dysphoria away from acceptance of their true, biological sexual identity.
>
> 8.      He was a practicing Christian at all relevant times and is still a practicing Christian.
>
> 9.      In August 2022, Dr. Lacy was hired to work as a physician in the infectious disease department for Christus Health as one of its hospitals -- Christus St. Vincent Regional Medical Center.
>
> . . . .
>
> 11.      During the morning of June 6, 2023, Dr. Lacy evaluated a patient admitted with a hip infection.
>
> . . . .
>
> 13.      At no time did the patient indicate any preferred pronouns, but Dr. Lacy inferred from the record that the patient was a biological male who wished to become a woman.
>
> 14.      The patient subsequently filed a complaint against Dr. Lacy for "misgendering" based on language Dr. Lacy used in the consultation report.  The patient indicated that Dr. Lacy refused to use preferred pronouns and was "short and curt," despite never informing Dr. Lacy of the preferred pronouns.
>
> . . . .
>
> 18.      On June 14, 2023, Dr. Lacy submitted a request for religious accommodation.
>
> 19.      This request expressed his belief, informed by his medical expertise and Christian faith, that sex and gender were determined by biology and was not a social

construct.  Dr. Lacy also expressed the belief that all human beings possess inherent worth because they are created in the image of God, indicating that he was willing to find an accommodation that would respect all transgender patients in his medical records.  He also offered to use gender-neutral language as an alternative to the compelled pronouns contrary to the patient's God-given and natural sex.

20.   The administrator refused to acknowledge Dr. Lacy's commitment to respecting all human beings and refused to engage in any process to find a suitable compromise.

21.   Dr. Lacy was summoned to a meeting and terminated on June 22, 2023, because he would not use "preferred" pronouns.

FAC ¶¶ 6-9, 11, 13-14, 18-21, at 2-5.  These allegations plausibly establish a prima facie case of religious discrimination based on a failure to accommodate.  Lacy alleges a bona fide religious belief -- grounded in his Christian faith -- that biology determines sex and gender, and that neither is a social construct.  See FAC ¶ 19, at 4.  He further alleges that he informs Christus St. Vincent of this belief on June 14, 2023, when he submits a written request for a religious accommodation and proposes the use of gender-neutral language as an alternative to compelled pronoun use.  See FAC ¶¶ 18-19, at 4.  Finally, Lacy alleges an adverse employment action: Christus St. Vincent declines to engage in any accommodation process and terminates him on June 22, 2023, for failing to use preferred pronouns.  See FAC ¶¶ 20-21, at 5.

Christus St. Vincent does not contend that Lacy fails to plead a prima facie case.  Instead, it argues that the requested accommodation -- and similar alternatives -- impose an undue hardship as a matter of law, an issue that the Court addresses below.  See Motion to Dismiss at 8.  The Court therefore concludes that the FAC plausibly alleges a prima facie claim of religious discrimination based on a failure to accommodate.

III.   **CHRISTUS ST. VINCENT CANNOT ESTABLISH AN UNDUE HARDSHIP AS A MATTER OF LAW, BECAUSE NEITHER STATE NOR FEDERAL LAW COMPELS PREFERRED PRONOUN USE.**

Christus St. Vincent cannot establish an undue hardship as a matter of law at the motion-

to-dismiss stage, because neither the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(F), nor 42 C.F.R. § 482.13(b)(1) compels preferred-pronoun use.  Once a plaintiff establishes a prima facie case of religious discrimination based on a failure to accommodate, the burden shifts to the employer to show that it offers a reasonable accommodation or cannot offer a reasonable accommodation without suffering an undue hardship.  See Thomas v. Natl. Assn of Letter Carriers, 225 F.3d at 1155.  An undue hardship exists only when the burden is "substantial in the overall context of an employer's business."  Groff v. Dejoy, 600 U.S. 447, 468 (2023)("Groff").

Because Christus St. Vincent makes no attempt to accommodate Lacy, he fails to state a plausible claim only if the Court holds -- as a matter of law -- that no accommodation is possible for an employee whose religious beliefs prohibit the use of pronouns that do not align with a person's biological sex.  See Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1490 (10th Cir. 1989)("Toledo")("An employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship.").  Put differently, Christus St. Vincent must show that State and federal law categorically require preferred pronoun use, and foreclose all accommodations -- a showing it does not make.  Christus St. Vincent's core argument is that no possible accommodation can accommodate Lacy's religious beliefs, because not using preferred pronouns always constitutes an undue hardship as a matter of law because it exposes the hospital to legal liability.  See Motion to Dismiss at 14.  To support this contention, Christus St. Vincent cites two provisions it contends the accommodation violates: the New Mexico Human Rights Act, N.M. Stat. Ann. § 28-1-7(F), and 42 C.F.R. § 482.13(b)(1).  See Motion to Dismiss at 12; Reply at 2.  As explained below, neither provision compels the use of preferred pronouns.

   A.   **THE NMHRA DOES NOT COMPEL THE USE OF PREFERRED PRONOUNS.**

Christus St. Vincent identifies NMHRA § 28-1-7(F) as the provision that allegedly makes accommodation of Lacy's religious beliefs impossible.  See Motion to Dismiss at 14 ("Put simply, there was no accommodation that could have been provided that would have resolved Plaintiff's religious conflict to using transgender patients' pronouns without discriminating against those patients.").  According to Christus St. Vincent, any accommodation short of compelled use of preferred pronouns violates § 28-1-7(F).  That argument overreads the statute.

Section 28-1-7(F) provides:

> It is unlawful discriminatory practice for:
>
> . . . .
>
> any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of race, religion, color, national origin, ancestry, sex, sexual orientation, gender, gender identity, pregnancy, childbirth or condition related to pregnancy or childbirth, spousal affiliation, physical or mental disability or military status; provided that the physical or mental disability is unrelated to a person's ability to acquire or rent and maintain particular real property or housing accommodation;

N.M. Stat. Ann. § 28-1-7(F).  The Court's task is to determine whether the Supreme Court of New Mexico would interpret this provision to require preferred pronoun usage as a matter of law.

### 1. The Applicable Interpretive Framework.

A federal district court sitting in diversity jurisdiction applies "state law with the objective of obtaining the result that would be reached in state court."  Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Where no controlling state precedent exists, the Court's must predict how the Supreme Court of New Mexico would resolve the issue.  See Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.).  Accordingly, the question before the Court is whether the Supreme Court of New Mexico would hold that § 28-1-7(F) compels the use of preferred pronouns -- or whether the statute instead prohibits discriminatory treatment while leaving room for neutral accommodations.

**2.        Christus St. Vincent Is a "Public Accommodation" Under the Act.**

Before turning to § 28-1-7(F)'s scope the Court must determine whether the provision applies to Christus St. Vincent.  Where a statute defines a term, courts interpret the statute according to those definitions, because they reflect legislative intent.  See State v. Tsosie, 2011-NMCA-115, 150 N.M. 754, ¶ 19, 266 P.3d 34, 39.  Section 28-1-7(F) applies to "any person in any public accommodation."   N.M. Stat. Ann. § 28-1-7(F).   The NMHRA defines "public accommodation" as "any governmental entity or any establishment that provides or offers its services, facilities, accommodations or goods to the public," excluding bona fide private clubs.  N.M. Stat. Ann. § 28-1-2(H).  Here, Christus St. Vincent offers healthcare services to the public.  See Motion to Dismiss at 13.  Christus St. Vincent therefore qualifies as a public accommodation subject to the NMHRA.

**3.        Section 28-1-7(F)'s Plain Text Prohibits Discrimination and Not Specific Speech.**

The Court next turns to § 28-1-7(F)'s text.  See State v. Gutierrez, 2023-NMSC-002, 523 P.3d 560, 565 ("The principal command of statutory construction is that the court should determine and effectuate the intent of the legislature, using the plain language of the statute as the primary indicator of legislative intent.").  Under the plain-meaning rule, "statutes are to be given effect as written without room for construction."  State v. Gutierrez, 2023-NMSC-002, 523 P.3d at 565.

Section § 28-1-7(F) makes it unlawful for "any person in any public accommodation to make a distinction, directly or indirectly, in offering or refusing to offer its services, facilities, accommodations or goods to any person because of . . . gender identity."  N.M. Stat. Ann. § 28-1-7(F).  The NMHRA defines "gender identity" as meaning "a person's self-perception, based on the person's appearance, behavior or physical characteristics, that the person exhibits more masculinity or femininity or the absence of masculinity or femininity whether or not it matches

- 26 -

the person's gender or sex assigned at birth."  N.M. Stat. Ann. § 28-1-2(H).  Because the statute does not define "distinction," the Court gives the term its ordinary meaning.  State v. Gutierrez, 2023-NMSC-002, 523 P.3d at 565.  Merriam-Webster defines "distinction" as "the act of perceiving someone or something as being not the same and often treating as separate or different." Mirriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/distinction (last visited January 8, 2026).  Read according to its plain meaning, § 28-1-7(F) prohibits treating one group differently from another in the provision of services because of gender identity.  The NMHRA does not prescribe any particular speech, nor does it mandate preferred pronoun usage.

Elane Photography, LLC v. Willock, 2013-NMSC-040, 309 P.3d 53 (N.M. 2013)("Elane"), confirms this understanding of § 28-1-7(F).  In Elane, a professional photographer refuses to photograph a same-sex wedding ceremony.  See 2013-NMSC-040, ¶ 7, 309 P.3d at 62. The Supreme Court of New Mexico holds that the refusal violates § 28-1-7(F), because the "NMHRA prohibits a public accommodation from refusing to serve a client based on sexual orientation."  Elane, 2013-NMSC-040, ¶ 18, 309 F.3d at 62.  Importantly, the Supreme Court of New Mexico emphasizes that the "NMHRA does not require [the photographer] to recite or display any message.  It does not even require [the photographer] to take photographs.  The NMHRA only mandates that if [the photographer] operates a business as a public accommodation, it cannot discriminate against potential clients based on their sexual orientation."  Elane, 2013-NMSC-040, ¶ 27, 309 F.3d at 64.  The Supreme Court of New Mexico further explains that the NMHRA "requires businesses that offer services to the public at large to provide those services without regard for race, sex, sexual orientation, or other protected classifications."  Elane, 2013-NMSC-040, ¶ 31, 309 F.3d at 65.  Thus, the photographer must photograph same-sex weddings only to the extent that it provides the same services to heterosexual couples.  See 2013-NMSC-040, ¶ 31, 309 F.3d at 65.

Taken together, this authority demonstrates what § 28-1-7(F) does and what it does not do. The NMHRA does not regulate speech, dictate viewpoints, or require an individual to affirm or express any particular message. Instead, it regulates conduct: public accommodations' provision of services. The statute draws a simple line: if a business chooses to offer services to the public, it must offer those same services on equal terms, without drawing distinctions based on protected characteristics such as gender identity. In other words, the NMHRA regulates equal treatment, not language; it requires that public accommodations provide services on the same terms and does not require that parties speak particular words.

4.      **The NMHRA Prohibits Offering Different Services Based on Gender Identity.**

Christus St. Vincent first argues that allowing a physician to use gender-neutral language when referring to transgender patients -- while using gendered pronouns for cisgender[2] patients -- constitutes unlawful differential treatment based on gender identity. See Motion to Dismiss at 12. While Christus St. Vincent's argument has symmetry and a certain elegance, the Court concludes that the Supreme Court of New Mexico would not agree with Christus St. Vincent's conclusion. Section 28-1-7(F) prohibits differential treatment because of gender identity. See N.M. Stat. Ann. § 28-1-7(F). Permitting Lacy to refer to transgender patients using gender-neutral pronouns while referring to cisgender patients using gendered pronouns treats the two groups differently. Lacy's stated reason for this distinction -- his refusal to use "pronouns contrary to the patient's God-given and natural sex," FAC ¶ 19, at 4 -- confirms that the distinction is drawn because of gender identity. Nonetheless, the Court does not predict that the Supreme Court of New Mexico would conclude that practice violates § 28-1-7(F).

---

[2] The Mirriam-Webster Dictionary defines Cisgender as "of, relating to, or being a person whose gender identity corresponds with the sex the person was identified as having at birth." Mirriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/cisgender (last visited, January 21, 2026).

The Supreme Court of New Mexico's decision in Elane provides the governing framework for this dispute. In Elane, the Supreme Court of New Mexico explains that a public accommodation violates § 28-1-7(F) when the business offers members of a protected class a narrower range of goods or services than it offers to others. See Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62. To illustrate the point, the Supreme Court of New Mexico offers a concrete example: a restaurant violates the statute if it provides a full menu to male customers but refuses to serve entrées to women, even if women can still order appetizers. See Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62. The NMHRA, the Supreme Court of New Mexico emphasizes, "does not permit businesses to offer a limited menu of goods or services to customers" based on protected status. Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62.

That logic does not compel the result that Christus St. Vincent advances. The difficulty for Christus St. Vincent's position lies in defining what counts as a "service" or "distinction" under the NMHRA. The New Mexico courts have not addressed whether misgendering, standing alone, constitutes a prohibited distinction in the provision of public accommodations. Elane frames the inquiry in terms of access to the "same services." Elane, 2013-NMSC-040, ¶ 31, 309 P.3d at 65. The question, therefore, is not whether the interaction feels different, but whether the protected class receives materially different goods or services.

The Court does not predict that the Supreme Court of New Mexico would classify pronoun usage, by itself, as a material difference in the provision of medical services. The NMHRA's purpose, as Elane explains, is to ensure that individuals may "obtain goods and services from a public accommodation without discrimination on the basis of" a protected characteristic. Elane, 2013-NMSC-040, ¶ 28, 309 P.3d at 64. The Legislature directs the statute at access -- the ability to receive the offered service on equal terms -- rather than at regulating every aspect of interpersonal expression that occurs during the provision of that service. A physician using

- 29 -

gendered pronouns still provides the same medical examination, diagnosis, prescriptions, referrals, and follow-up care as any other patient. The goods and professional services exchanged remain identical.

Pronoun usage can carry dignitary weight, and the Court does not discount that impact. The NMHRA's text and Elane's reasoning focus on whether the public accommodation denies the protected class a service, restricts the protected class' ability to get a service, or materially burdens the protected class' access to the service. See Elane, 2013-NMSC-040, ¶ 28, 309 P.3d at 65. In Elane, the Supreme Court of New Mexico explains that a restaurant would violate § 28-1-7(F) if it offers a full menu to male customers but refuses to serve entrées to women, even if women could still order appetizers. See Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62. The NMHRA, the Supreme Court of New Mexico emphasizes, "does not permit businesses to offer a limited menu of goods or services to customers" based on protected status. Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62. That hypothetical clarifies two points. First, discrimination under the NMHRA includes more than total exclusion; a business violates the statute when it provides a narrower range of goods to a protected class. Second, the violation in the restaurant example is concrete and material. The restaurant denies women access to part of the restaurant's core offering. Their menu is objectively smaller. Here, by contrast, the public accommodation does not deny transgender patients examinations, diagnoses, prescriptions, referrals, or follow-up care available to cisgender patients. The medical services -- the goods exchanged -- remain the same. The difference, therefore, is between limiting what is sold and regulating how it is delivered. Elane's restaurant example concerns the former: fewer goods. The pronoun dispute concerns the latter: the language used during an otherwise identical service interaction. Because Elane's reasoning is tied to equal access to goods and services, the Court predicts that the Supreme Court of New Mexico would not equate pronoun usage, standing alone, with a reduced "menu" under § 28-1-

7(F).

The Court also does not predict that the Supreme Court of New Mexico would find that using biological gendered pronouns would violate § 28-1-7(F) for two additional reasons.  First, making the use of biological gendered pronouns for all individuals in New Mexico illegal would be a profound social change.  The Court is cautious about interpreting general non-descript law as banning the use of biological gendered pronouns.  Not only would it be an enormous change for society, but it would be one that the Legislature has not mandated.  Furthermore, banning the use of biological gendered pronouns is unlikely to change conduct in companies with a large number of employees.  The Court should not adopt an interpretation that attempts to make profound societal change, and likely will be ignored and not cause large-scale changes in conduct, without a more express instruction from the Legislature.

Second, banning biological gender pronouns would be a disingenuous way of requiring preferred pronouns.  Large public accommodations are unlikely to outlaw biological gender pronouns, but just will require preferred pronouns.  It seems a slight of hand for the Court to write an entire section and say that § 28-1-7(F) does not mandate preferred pronouns and then force pronouns by adopting an interpretation that bans biological gender pronouns.  The Court declines to predict that the Supreme Court of New Mexico would adopt an interpretation that mandates preferred pronouns or bans biological gender pronouns.[3]

---

[3] The Court's prediction rests in part on the distinction between regulating conduct and compelling speech, and on the huge importance that America gives free speech.  Section 28-1-7(F) prohibits discrimination in the provision of goods and services -- that is, unequal treatment in action.  It does not expressly regulate the words a speaker must use.  It is unlikely that the Supreme Court of New Mexico would read the statute's general prohibition on discriminatory treatment as silently compelling particular speech, especially in the absence of clear Legislative direction. Compelled expression raises distinct concerns that differ in kind from regulating discriminatory conduct.  If the Legislature intends to require specific pronoun usage in all public accommodations, it says so expressly.  The Court does not predict that the Supreme Court of New Mexico would infer such a sweeping mandate from the statute's broad and conduct-focused language.

Accordingly, the Court concludes that the Supreme Court of New Mexico likely will not hold that a public accommodation violates § 28-1-7(F) merely by using gendered pronouns for all customers. That conclusion, however, does not end the analysis. Even if this particular theory does not establish a statutory violation, the Court still must consider whether the use of gender-neutral language -- as opposed to preferred pronouns -- independently violates § 28-1-7(F). In other words, the absence of a violation under one framing does not resolve whether a different pronoun policy constitutes an unlawful distinction. The Court therefore turns to whether a uniform policy of gender-neutral language satisfies the statute or instead runs afoul of its command of equal treatment.

5.      **Uniform Use of Gender-Neutral Language is Equal Treatment Under the Statute.**

Christus St. Vincent next contends that allowing a physician to refer to all patients using gender-neutral language nonetheless violates § 28-1-7(F) and exposes the hospital to liability. See Motion to Dismiss at 14; Reply at 4. The Court concludes that the Supreme Court of New Mexico would conclude, if presented with this issue, that gender-neutral pronouns do not violate the NMHRA.

Section 28-1-7(F) generally prohibits differential treatment, because of gender identity; it does not compel the use of any particular speech. An accommodation permitting uniform use of gender-neutral language treats all patients the same and therefore does not, on its face, violate the statute. The Court predicts that the Supreme Court of New Mexico would find unconvincing Christus St. Vincent's argument that equal treatment nonetheless disproportionately harms transgender patients. See Reply at 4. The assertion that equal treatment disproportionately harms transgender patients rests on unsupported generalizations about how different groups might feel. See Reply at 4. Christus St. Vincent cites no authority -- legal, medical, or otherwise -- to

substantiate its conclusion.   Nor does it identify any authority holding that § 28-1-7(F) requires preferred pronoun usage as a matter of law.   This omission is because the statute targets discriminatory access to services and not the failure to use preferred pronouns where the public accommodation can achieve equal treatment through alternative means.

The Elane example again illustrates why uniform gender-neutral language complies with § 28-1-7(F).  A public accommodation violates the statute when the business offers a "full menu" of services to one group but a reduced set of services to another based on a protected characteristic. Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62.  That action is discrimination, because the service itself differs by group.  By contrast, no violation occurs when the same services are offered to everyone.  A restaurant that serves only appetizers to all customers may offer a limited menu, but it does not discriminate, because it draws no distinction among patrons.  See Elane, 2013-NMSC-040, ¶ 19, 309 P.3d at 62.  The same principle applies here.  When a physician uses gender-neutral language for all patients, the physician is not offering different services to different groups; the service is the same for everyone.  Because § 28-1-7(F) targets distinctions between groups -- not the content of speech used uniformly -- the consistent use of gender-neutral language does not violate § 28-1-7(F).

The Court does not agree with the suggestion that a hospital violates § 28-1-7(F) solely because individual physicians adopt different, uniformly applied preferred pronoun policies. Section 28-1-7(F) prohibits distinctions drawn because of a patient's gender identity.  Section § 28-1-7(F) does not require institutional uniformity in speech across all providers.  For example, one physician may use gender-neutral pronouns for all patients, while another uses preferred pronouns for all patients.  In both cases, the public accommodation does not treat differently the patients because of their gender identity; any difference in experience stems solely from which physician they see.  The NMHRA does not convert provider-to-provider differences into unlawful

discrimination.   To hold otherwise would stretch § 28-1-7(F) beyond its text, transforming a prohibition on discriminatory distinctions into a mandate of institutional uniformity -- something the statute neither says nor implies.

In sum, the NMHRA does not require preferred pronoun usage as a matter of law.   It requires equal treatment.   Uniform use of gender-neutral language treats all patients the same and therefore complies with § 28-1-7(F).

**6.      Comparative State Law Regarding a Pronouns Mandate.**

A comparative look at other State anti-discrimination regimes confirms the Court's conclusion that the Supreme Court of New Mexico would not interpret § 28-1-7(F) to compel the use of preferred pronouns.   Where Legislatures have mandated pronoun usage, they have done so expressly, through targeted and carefully cabined statutes, and not through general prohibitions on discrimination in public accommodations.

For example, California law requires Department of Corrections personnel to use an individual's specified pronouns and honorifics.   The statute provides: "Staff, contractors, and volunteers of the department shall not consistently fail to use the gender pronoun and honorific an individual has specified in all verbal and written communications with or regarding the individual that involve use of pronouns and honorific."   West's Ann. Cal. Penal Code § 2605.   This mandate is explicit, and the California Legislature limits this instruction to a defined category of State actors operating within a specific institutional context.

Similarly, Colorado law mandates pronoun-adjacent speech in public schools.   There, a "public school employee, educator, and contractor . . . shall address a student by the student's chosen name and use the student's chosen name in school and during extracurricular activities."   C.R.S.A. § 22-1-145.   Again, the Legislature speaks directly and unambiguously, imposing a speech requirement on a discrete subset of public employees in an educational setting.

- 34 -

By contrast, in conducting its review, the Court has been unable to identify a State statute that compels preferred pronoun usage across the sweeping category of "public accommodations." Instead, where pronoun mandates exist, the State Legislature narrowly draws and confines the mandate to specific public institutions -- such as prisons or public schools -- where Legislatures have made a deliberate judgment to regulate speech directly.

That distinction matters.  Public accommodations encompass a broad range of private actors, including hospitals, restaurants, hotels, retailers, and countless other enterprises employing millions of individuals across diverse professional contexts.  If the New Mexico Legislature intends to impose a compulsory pronoun regime on that entire category, it can do so expressly. The New Mexico Legislature has not mandated compelled pronouns.  The Court also has undertaken an exhaustive review of the caselaw and cannot find a case where a State court has interpreted the NMHRA to require the use of preferred pronouns.  The Court also looked at federal law to see if a federal court has concluded that a similar antidiscrimination act requires preferred pronouns and has not.  In other words, the Court has not found a federal case from any jurisdiction or a State case that holds that pronouns are compelled in this instance.

Against that backdrop, the Court concludes that it is highly unlikely that the Supreme Court of New Mexico would become the first State high court to read a generalized anti-discrimination provision as imposing a mandate of preferred pronouns on private citizens operating public accommodations.  Section 28-1-7(F) prohibits discriminatory treatment; it does not compel preferred pronouns.  The absence of explicit statutory language -- especially when contrasted with other States' deliberate and narrow pronoun mandates -- suggests that § 28-1-7(F) does not compel the use of preferred pronouns as a matter of law.

**B.** **42 C.F.R. §§ 482.13(b)(1), (c)(3) DO NOT COMPEL THE USE OF PREFERRED PRONOUNS.**

Christus St. Vincent next argues that 42 C.F.R. §§ 482.13(b)(1) and (c)(3) compel every Medicare and Medicaid participating hospital in the United States to use patients' preferred pronouns. See Reply at 2. Section 482.13 requires hospitals to "protect and promote each patient's rights," including the right to "participate in the development and implementation of his or her plan of care," 42 C.F.R. § 482.13(b)(1), and the right to be "free from all forms of abuse or harassment," 42 C.F.R. § 482.13(c)(3). The interpretive guidelines explain that hospitals must plan a patient's care, with patient participation, to meet the patient's psychological and medical needs. 42 C.F.R. § 482.13(b)(1), Interpretive Guidelines, A-0130. Christus St. Vincent argues that, as a Medicare and Medicaid participating hospital, Christus St. Vincent is subject to these federal regulations, which establish the conditions hospitals must meet to receive reimbursement. See Reply at 2. According to Christus St. Vincent, these provisions create a regulatory obligation such that granting Lacy an accommodation permitting him to use gender-neutral pronouns would conflict with federal law and impose an undue hardship. Reply at 2. In its view, once a patient identifies a gender identity and preferred pronouns, a physician's refusal to use those pronouns constitutes harassment and interferes with the patient's right to meaningful participation in care. See Reply at 2.

The Court remains unconvinced. At bottom, Christus St. Vincent equates the refusal to use preferred pronouns with actionable harassment under § 482.13. Christus St. Vincent cites, however, no legal authority, regulation, or medical literature supporting the proposition that the use of gender-neutral language, rather than a patient's preferred pronouns, constitutes abuse or harassment. Taken to its logical conclusion, Christus St. Vincent's theory means that a hospital violates § 482.13 whenever a patient asks a physician to speak in a particular manner, the physician declines, and the patient subjectively characterizes that refusal as harassment. For example, if a patient demands that a physician refer to them exclusively by a particular nickname or honorific

in all oral communications and medical records, a physician's refusal to do so would not plausibly constitute abuse or harassment under § 482.13.  Christus St. Vincent offers no principled basis, however, for distinguishing that scenario from the one it advances here.  Because §§ 482.13(b)(1) and (c)(3) do not compel the use of preferred pronouns, the Court denies the Motion to Dismiss insofar as it relies on those provisions.

### C.   CHRISTUS ST. VINCENT CANNOT ESTABLISH AN UNDUE HARDSHIP AS A MATTER OF LAW.

Having established that neither § 28-1-7(F) nor §§ 482.13(b)(1), (c)(3) compels the use of preferred pronouns, the analysis turns to whether Christus St. Vincent can establish undue hardship as a matter of law.  Once Lacy establishes his prima facie case of religious discrimination based on a failure to accommodate, the burden shifts to Christus St. Vincent to show that it offers a reasonable accommodation or cannot offer a reasonable accommodation without suffering an undue hardship.  See Thomas v. Natl. Assn of Letter Carriers, 225 F.3d at 1155.

An undue hardship exists only when the burden is "substantial in the overall context of an employer's business."  Groff v. Dejoy, 600 U.S. 447, 468 (2023)("Groff").  Importantly, any asserted hardship must be actual and concrete; an employer "cannot rely merely on speculation." Toledo, 892 F.2d at 1492.  See Tooley v. Martin-Marietta Corp., 648 F.2d 1239, 1243 (9th Cir. 1981)("A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships. . . .  The *magnitude* as well as the *fact* of hardship must be determined by examination of the facts of each case.").  "[T]he employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."  Toledo, 892 F.2d at 1490.  Indeed, the Tenth Circuit has made the employer's burden especially demanding where, as here, the employer makes no effort to accommodate: "[A]n employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him

may only prevail if it shows that no accommodation could have been made without undue hardship." Toledo, 892 F.2d at 1490.

Christus St. Vincent essentially concedes that it makes no efforts to accommodate Lacy before taking adverse action. See MTD at 13. That concession is consequential. Because it does not engage in the interactive process, it may prevail only if it can demonstrate that every conceivable accommodation necessarily would impose a substantial hardship. Toledo, 892 F.2d at 1490. Christus St. Vincent's argument reduces to a single proposition: that § 28-1-7(F) and §§ 482.13(b)(1), (c)(3) require the use of preferred pronouns, such that any accommodation permitting Lacy to decline their use necessarily violates the law and exposes the hospital to liability. See MTD at 13-16; Reply at 2.

That premise fails. As the Court explains, the identified statutes and regulations do not mandate the use of preferred pronouns. They require equal access to services -- nothing more. They say nothing about which words public accommodations must use. If the law does not mandate preferred pronouns, then allowing a physician to decline to use them is not automatically unlawful. Section 28-1-7(F) and §§ 482.13(b)(1), (c)(3) regulate discrimination in services and in not vocabulary. Nothing in those provisions prohibits a physician from addressing all patients uniformly -- whether by using gendered pronouns for everyone or by using gender-neutral language for everyone. Because the law leaves room for those approaches, Christus St. Vincent cannot argue that every possible accommodation would necessarily violate it.

Christus St. Vincent's reliance on Trueblood v. Valley Cities Counseling and Consultation, 748 F. Supp. 3d 988 (W.D. Wash. 2024)(Robert, J.,)("Trueblood"), does not alter that conclusion. See Motion to Dismiss at 14. Trueblood does not stand for the proposition that any accommodation relating to pronoun usage necessarily creates undue hardship. To the contrary, it underscores why Christus St. Vincent's categorical argument fails.

First, Trueblood applies a materially different legal framework.  There, the employer engages in the accommodation process by evaluating specific proposed accommodations before terminating the employee.  See 748 F. Supp. 3d at 997.  Judge Robart addresses whether the specific requested accommodations impose an undue hardship.  See 748 F. Supp. 3d at 1003.  Here, by contrast, Lacy plausibly alleges that Christus St. Vincent fails to engage in the accommodation process.  Under Tenth Circuit precedent, that failure heightens -- not relaxes -- the employer's burden.  See Toledo, 892 F.2d at 1490.  Christus St. Vincent must show that no accommodation can be made without undue hardship.  See Toledo, 892 F.2d at 1490.  Christus St. Vincent has not met this burden.  Christus St. Vincent's sole theory of hardship depends on the assertion that § 28-1-7(F) or §§ 482.13(b)(1), (c)(3) mandates preferred pronouns -- a proposition the Court does not adopt.

Second, Trueblood is factually distinguishable.  The employee proposes several accommodations: (i) not working with clients who use preferred pronouns; (ii) addressing clients who use preferred pronouns by name while addressing cisgender clients by pronoun; (iii) declining to give his own pronouns during introductions; (iv) omitting pronouns from his email signature; and (v) using only the names of clients who use preferred pronouns while continuing to use pronouns for cisgender clients.  See Trueblood, 748 F. Supp. 3d at 997.  Judge Robart rejects those accommodations, because they treat groups differently by permitting the plaintiff to address transgender clients in one manner and cisgender clients in another.  See 748 F. Supp. 3d at 1004-05. Judge Robart concludes that such unequal treatment violates State and federal anti-discrimination laws, and therefore imposes an undue hardship.  See  748 F. Supp. 3d at 1008.

Even accepting, for the sake of argument, the reasoning in Trueblood, Christus St. Vincent still cannot establish undue hardship on this record.  Lacy does not need every proposed accommodation to be lawful or workable.  He needs only one.  If a single reasonable

accommodation exists that would not impose undue hardship, the employer cannot prevail as a matter of law. One such accommodation is materially different from those Judge Robart rejects in Trueblood. There, the proposed accommodations expressly treat transgender and cisgender clients differently -- for example, using pronouns for one group but not the other. Here, by contrast, the record reflects the availability of a uniform approach under which Lacy would address all patients and colleagues -- transgender and cisgender alike -- either by name or by using gender-neutral language, while avoiding gendered pronouns altogether.

This accommodation applies the same rule to everyone. Whatever one thinks of its wisdom or practicality, it does not, on its face, draw distinctions based on gender identity. Because only one workable accommodation is necessary to defeat an undue-hardship defense at this stage, the existence of that uniform option is sufficient to preclude dismissal. Christus St. Vincent effectively acknowledged as much at oral argument, when the Court poses a hypothetical accommodation:

> **Court:**       But what if the doctor agrees to call her Mary. . . .  I have a problem with pronouns, but I'll call her Mary.
>
> **Christus St. Vincent:**       I think that could potentially get you there Judge that could potentially be a reasonable accommodation . . . ."

Transcript of Hearing at 21:8-19 (taken December 1, 2025)(Court, Koronka). That concession is significant. At the pleading stage, Christus St. Vincent argues that any accommodation short of using preferred pronouns is impossible without imposing undue hardship. Yet at oral argument, counsel acknowledges that a uniform approach -- addressing all patients by name or using gender-neutral language -- "could potentially" be a reasonable accommodation. This is Christus St. Vincent's retreat from its initial position: meaning that what Christus St. Vincent once maintains was impossible is now, at minimum, plausibly workable. That acknowledgment underscores that Christus St. Vincent cannot show undue hardship as a matter of law.

In sum, Christus St. Vincent has not shown that every accommodation imposes a

substantial burden in the overall context of its operations.  It instead advances a sweeping legal theory that collapses once the underlying statutory premise is rejected.  Under Groff and Toledo, speculation about hypothetical liability is insufficient.  See Toledo, 892 F.2d at 1492.  On the pleadings before the Court, Christus St. Vincent does not establish undue hardship as a matter of law.  The Court therefore denies the MTD insofar as relies on proving an undue hardship as a matter of law.

### III.    A STATUTE REQUIRING PRIVATE PHYSICIANS TO USE PREFERRED PRONOUNS VIOLATES THE PHYSICIAN'S FREEDOM OF SPEECH.

President George Washington once warned: "For if Men are to be precluded from offering their sentiments on a matter, which may involve the most serious and alarming consequences, that can invite the consideration of Mankind, reason is of no use to us; the freedom of Speech may be taken away, and, dumb and silent we may be led, like sheep, to the Slaughter."  Address to the Officers of the Army, George Washington (March 15, 1783).  As Christus St. Vincent reads the NMHRA and 42 C.F.R. §§ 482.13(b)(1), (c)(3), that warning becomes a reality.

Lacy contends that if Christus St. Vincent's reading on the NMHRA and 42 C.F.R. §§ 482.13(b)(1), (c)(3) is correct -- if those provisions compel physicians to use preferred pronouns -- then the statutes are unconstitutional under the First Amendment.  See Response at 21.  Christus St. Vincent responds that no Constitutional problem exists, because Lacy's speech is not an "expressive work," but rather "non-expressive . . . professional communication in a healthcare setting."  See Reply at 8.  The Court agrees with Lacy's interpretation of the law.

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech.  See National Institute of Family and Life Advocates v. Becerra, 585 U.S. 755, 766 (2018)("NIFLA").  The Supreme Court precedent distinguishes "between content-based and content neutral regulations of speech.  Content-based

regulations 'target speech based on its communicative content.'" NIFLA, 585 U.S. at 766 (citing Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)). As a general matter, content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interest." NIFLA, 585 U.S. at 766. See Telescope Media Group v. Lucero, 936 F.3d 740, 754 (8th Cir. 2019)("Laws that compel speech or regulate it based on its content are subject to strict scrutiny[.]").

If the Supreme Court of New Mexico reads the NMHRA to require private physicians to use preferred pronouns or this Court read the same of 42 C.F.R. §§ 482.13(b)(1), (c)(3), it would impose a content-based regulation of speech. "By compelling individuals to speak a particular message, such notices 'alter the content of their speech.'" NIFLA, 585 U.S. at 766. See Riley v. National Federation of the Blind of North Carolina, Inc., 487 U.S. 781, 795 (1988)("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech."). Under Christus St. Vincent's reading of both statutes, Christus St. Vincent's employees must use preferred pronouns whenever a patient requests them. See Reply at 10. Lacy alleges that he does not wish to use preferred pronouns because using pronouns inconsistent with biological sex conflicts with his sincerely held religious beliefs and medical realities. See Complaint ¶ 19, at 4. Requiring Lacy to speak words he rejects "alters the content" of his speech. NIFLA, 585 U.S. at 766. Therefore, as Christus St. Vincent reads NMHRA and 42 C.F.R. §§ 482.13(b)(1), (c)(3), strict scrutiny applies.

Christus St. Vincent does not argue whether strict scrutiny governs. Instead, it argues that its reading does not compel speech in violation of the First Amendment, relying on 303 Creative LLC v. Elenis, 600 U.S. 570 (2023)("303 Creative"). Reply at 8. In 303 Creative, the Supreme Court considers a challenge to a Colorado anti-discrimination law that forbids businesses from engaging in discrimination when they sell goods and services to the public. See 600 U.S. at 577.

There, Colorado seeks to compel the plaintiff's speech by forcing her to create wedding websites for marriages that conflict with her beliefs about same sex marriages.  See 600 U.S. at 581.   The Supreme Court holds that Colorado cannot force the plaintiff to create the websites, because "the First Amendment extends to all persons engaged in expressive conduct, including those who seek profit (such as speechwriters, artists, and website designers)."  600 U.S. at 600.  There is no question the plaintiff's speech in 303 Creative is expressive conduct, because the parties stipulate that the customer websites are expressive conduct.  See 600 U.S. at 599.  Thus, although the Supreme Court holds that Colorado has a compelling interest in eliminating discrimination in places of public accommodation, that interest does not prevail over the plaintiff's Constitutional right to choose the content of own messages.  600 U.S. at 592.

Christus St. Vincent invokes 303 Creative to argue that the First Amendment is not implicated here, because Lacy's speech is not expressive.  See Reply at 8.  According to Christus St. Vincent, requiring a physician to use preferred pronouns neither conveys an "ideological message" nor qualifies as expressive conduct, but instead regulates routine professional communication.  Reply at 8.  As Christus St. Vincent sees it, professional and workplace conduct does not qualify as expressive conduct and thus is not subject to First Amendment protections. The Court disagrees with Christus St. Vincent's conclusion.

The Supreme Court acknowledges that "determining what qualifies as expressive activity protected by the First Amendment can sometimes raise difficult questions."  303 Creative, 600 U.S. at 599.  In 303 Creative, determining whether the plaintiff's speech is expressive activity is a simple task, because the parties stipulate that the speech is expressive activity.  See 600 U.S. at 599.  The Supreme Court agrees with the parties' stipulation, because the plaintiff is creating custom wedding websites celebrating her customer's weddings.  See 600 U.S. at 589.  The Supreme Court also concludes that there is expressive conduct, however, in contexts removed from

art.  See Rumsfeld v. Forum for Academic and Institutional Rights, Inc., 547 U.S. 47, 61-62 (2006)("Rumsfeld")(concluding that the posting of logistical notices stating "[t]he U.S. Army recruiter will meet interested students in Room 123 at 11 a.m." to be expressive conduct.[4]); see Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557 (1995)("Hurley")(concluding that participation in a parade is expressive conduct).  The core concept in determining expressive conduct is the communication of ideas.  See Hurley, 515 U.S. at 569.

Here, compelling Lacy to use preferred pronouns likewise compels expressive conduct. Christus St. Vincent effectively concedes this determination, asserting that transgender patients are "denied affirmation of their gender identity when staff refuse to use their expressed pronouns[.]"  Motion to Dismiss at 4.  That admission underscores the point: pronoun usage communicates a message.   In the medical context, it is not casual or incidental.  Physicians use sex-based language as part of diagnosis and patient safety.  Pronouns in that setting convey professional judgments about biological classification and medical reality.  Requiring Lacy to adopt preferred pronouns therefore compels him to express a message he rejects.

Christus St. Vincent's fallback argument -- that speech loses First Amendment protection when it occurs in a professional setting -- fares no better.  See Reply at 8.  Christus St. Vincent provides no citation for the proposition that private speech eludes the classification of expressive conduct if it qualifies as professional communication.  This omission is likely because the Supreme Court expressly rejects a "professional speech" carve-out.  NIFLA 585 U.S. at 767 ("Speech is not

---

[4] In Rumsfeld, the Supreme Court found that the First Amendment was not violated because the compelled speech, although expressive activity, was incidental from the speech at issue in the "leading First Amendment precedents that have established the principle that freedom of speech prohibits the government from telling people what they must say." 303 Creative, 600 U.S. at 596 (citing Rumsfeld, 547 U.S. at 62.

unprotected merely because it is uttered by professionals."). In <u>NIFLA</u>, California could not compel private doctors to provide abortion-related notices they oppose. <u>See</u> 585 U.S. at 767. The Supreme Court recognizes only two narrow circumstances where professional speech may receive reduced protection. <u>See</u> <u>NIFLA</u>, 585 U.S. at 768. First, a more deferential review applies to laws that require "professionals to disclose factual, noncontroversial information in their 'commercial speech.'" <u>NIFLA</u>, 585 U.S. at 768. Second, "States may regulate professional conduct, even though that conduct incidentally involves speech." <u>NIFLA</u>, 585 U.S. at 768. Neither exception applies here.

The first exception is not present because compelled pronoun usage is neither factual, noncontroversial, nor commercial speech. Courts have recognized that pronoun usage reflects contested questions about sex and gender, not settled or value-neutral facts. <u>See</u> <u>Defending Education v. Olentangy Local School District Board of Education</u>, 158 F.4th 732, 757 (6th Cir. 2025)("<u>Defending Education</u>"). As the Sixth Circuit recently observes, for most of the Nation's history, biological pronouns are understood as the proper way to refer to others, and, even today, many States prohibit schools from punishing teachers or students for declining to use preferred pronouns. <u>See</u> <u>Defending Education</u>, 158 F.4th at 757. Nor does compelled pronoun usage qualify as commercial speech. Under the Supreme Court's framework, speech is commercial only when there is strong support for that classification, such as when the speech takes the form of an advertisement, refers to a specific product, and is economically motivated. <u>Hunt v. City of L.A.</u>, 638 F.3d 703, 715 (9th Cir. 2011)(citing <u>Bolger v. Youngs Drug Products Corp.</u>, 463 U.S. at 66-67). The use of preferred pronouns satisfies none of these criteria. It does not advertise a product, propose a commercial transaction, or serve an economic purpose.

The second exception likewise does not apply, because compelling the use of preferred pronouns regulates speech itself, not professional conduct that only incidentally involves speech.

The Supreme Court allows States to regulate professional conduct, such as through malpractice rules, even when that regulation touches speech, because such rules fall within the traditional domain of regulating conduct. See NAACP v. Button, 371 U.S. 415, 438 (1963). Here, however, the regulation does not target conduct at all. It dictates the precise words a physician must speak. For that reason, Christus St. Vincent's attempt to recharacterize compelled pronoun usage as "professional speech" entitled to diminished First Amendment protection is unpersuasive, and the Court cannot exclude the regulation from full Constitutional scrutiny.

Highlighting the importance of full Constitutional scrutiny, the Supreme Court cautions that content-based regulation of speech is especially dangerous "in the fields of medicine and public health, where information can save lives." Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011). Further, the Supreme Court notes:

> [W]hen the government polices the content of professional speech, it can fail to "'preserve an uninhibited marketplace of ideas in which truth will ultimately prevail.'" *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields. Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana; lawyers and marriage counselors might disagree about the prudence of prenuptial agreements or the wisdom of divorce; bankers and accountants might disagree about the amount of money that should be devoted to savings or the benefits of tax reform. "The best test of truth is the power of the thought to get itself accepted in the competition of the market," *Abrams v. United States*, 250 U.S. 616, 630 (1919), and the people lose when the government is the one deciding which ideas should prevail.

NIFLA, 585 U.S. at 773. The Constitution demands greater, not lesser, skepticism when the State seeks to dictate what physicians must say.

Accordingly, because the statutes, as read by Christus St. Vincent, compel speech, the Court applies strict scrutiny. Strict scrutiny requires a showing that the statute's speech restrictions: (i) advance a compelling State interest; and (ii) are narrowly tailored to serve that interest. See Chandler v. City of Arvada, 292 F.3d 1236, 1241 (10th Cir. 2002). In addition, "if a

less restrictive alternative would serve the [State's] purpose, the legislature must use that alternative." United States v. Playboy Entm't Grp., Inc., 529 U.S. 80, 813 (2000).

Looking to whether a compelling interest exists, the Court does not minimize the importance of anti-discrimination laws.  The Supreme Court recognizes that "governments in this country have a 'compelling interest' in eliminating discrimination in places of public accommodation." 303 Creative, 600 U.S. at 590 (citing Roberts v. United States Jaycees, 468 U.S. 609, 628 (1984)).  The Supreme Court also recognizes that public accommodations laws "vindicate the deprivation of personal dignity that surely accompanies denials of equal access to public establishments." 303 Creative, 600 U.S. at 590.  But that interest does not extend from equal access to public establishments to compelling physicians to use preferred pronouns.  "Regulating speech because it is discriminatory or offensive is not a compelling state interest, however hurtful the speech may be." Telescope Media Group v. Lucero, 936 F.3d 470, 755 (8th Cir. 2019).  It is a "bedrock principle . . . that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989).  See Masterpiece Cakeshop, 584 U.S. 617, 638 (2018)("[I]t is not . . . the role of the State or its officials to prescribe what shall be offensive.").

Notably, Christus St. Vincent's interpretation does not concern access to medical care, but compelled language within it.  Yet it cites no authority establishing that a physician's refusal to use preferred pronouns -- or use of gender-neutral language -- causes cognizable harm.  See Reply at 4; Defending Education v. Olentangy Local School District Board of Education, 158 F.4th at 757 (finding no evidence for the proposition that using biological pronouns is "abusive.").  The Court therefore does not see a compelling interest in compelling physicians to use preferred pronouns.

Even assuming the existence of a compelling interest, the policy does not survive strict

- 47 -

scrutiny, because it is not narrowly tailored.  It is overinclusive in the most basic sense: it suppresses more speech than necessary to achieve its stated aim.  See Republican Party of Minn. v. White, 536 U.S. 765, 775 (2002).  Under Christus St. Vincent's reading, a private physician is prohibited from using gender-neutral language with all patients, even though such language treats every patient equally and avoids compelled ideological expression.  If the asserted purpose is to ensure private doctor's do not treat transgender patients differently, gender-neutral language fully accomplishes that objective without forcing physicians to affirm contested propositions.  By mandating preferred pronouns instead of permitting neutral alternatives, the policy unnecessarily burdens protected speech.  The preferred pronouns mandate therefore cannot survive strict scrutiny.

The breadth of speech that the First Amendment protects reinforces the Court's conclusion. In Snyder v. Phelps, 562 U.S. 443 (2011), the Supreme Court allows Westboro Baptist Church to carry signs that say "Thank God for Dead Soldiers," "Thank God for IEDs," and "Priests Rape Boys" outside of miliary funerals.  562 U.S. at 755.  In National Socialist Part of America v. Village of Skokie, 432 U.S. 443, the Supreme Court allows Nazis to march in areas that Jewish residents heavily populate.  See 432 U.S. 443, 778-49.  In Texas v. Johnson, 491 U.S. 397 (1989), the Supreme Court states that an activist can burn the American flag as a form of political protest. See 491 U.S. at 399.  In NIFLA, California cannot compel doctors to provide their patients with information about abortions that the doctors do not support.  See 585 U.S. at 779.

Against that backdrop, the Constitution does not permit the government to dictate the words that a private physician must use in the examination room solely because the State prefers those words rather than those the speaker chooses.  The First Amendment has long protected speech that is controversial, offensive, or unpopular, and it does so precisely to prevent the State from deciding which messages may be spoken and which must be suppressed.  That protection

does not disappear at the hospital's door.  If freedom of speech is to remain in this country, it means the government may not force a private physician to say what the physician does not believe.

**IT IS ORDERED** that Defendant Christus St. Vincent Regional Medical Center's Motion to Dismiss Defendant Mark Lacy's Claims, filed July 22, 2025 (Doc. 17), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Parker Allen Bowman
Binnall Law Group
Alexandira, Virginia

*Attorneys for the Petitioner*

Kevin Koronka
Husch Blackwell
Austin, Texas

*Attorneys for the Defendant*